

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00335-CV

IN THE INTEREST OF D.A.T., K.J.T.,
T.D.T., AND S.S.T., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION ON REHEARING[1]

----------

After considering Appellant I.J.T.'s motion for rehearing, we deny the motion but withdraw our prior opinion and judgment of January 26, 2012, and substitute the following.

## I. Introduction

Appellants I.J.T. (Father) and W.T. (Mother) appeal the trial court's judgment terminating their parental rights to four of their children. After a bench trial, the trial court found by clear and convincing evidence that Father and

---

[1]*See* Tex. R. App. P. 47.4.

Mother had (1) engaged in conduct or knowingly placed the children with persons who had engaged in conduct which endangered the physical or emotional well-being of the children, (2) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, and (3) previously had their parent-child relationships terminated with respect to another child based on these same grounds.[2] The trial court also found that termination of Mother's and Father's parent-child relationships would be in the children's best interest and appointed the Department of Family and Protective Services (the Department) as the children's permanent managing conservator. Father challenges the factual sufficiency of the evidence in four issues, and Mother's court-appointed counsel has filed a motion to withdraw and an *Anders* brief in support stating that after diligently reviewing the record, he believes that any appeal by Mother would be frivolous.[3] Although given notice and an opportunity to file a pro se brief, Mother did not do so. We affirm the trial court's judgment terminating Father's and Mother's parental rights.

---

[2]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (M) (West Supp. 2011).

[3]*See Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396 (1967).

## II. Background

Mother and Father have six children together. The four children involved in this case are D.A.T., K.J.T., T.D.T., and S.S.T. At the time of trial in September 2010, D.A.T. was eleven years old, K.J.T. was nine years old, T.D.T. was eight years old, and S.S.T. was five years old. In separate proceedings in 2008 in Lubbock County, Texas, Mother's and Father's parental rights to two other children, H.T. and D.T., were terminated.

Ashleigh Baumgarten is a Department caseworker in Lubbock. She served as Mother and Father's caseworker for almost three years beginning in approximately August 2005, and she testified that she was familiar with Mother and Father's lengthy history with the Department. She testified that they had exhibited a pattern of neglectful supervision of their children and that the Department had been concerned for years about the manner in which they supervised (or failed to supervise) their children. Mother and Father's first Department referral was in December 1997 and involved an allegation of neglectful supervision; the report alleged that Mother and Father's two year old had sprayed oven cleaner in their nine-month old's face.[4] Baumgarten also testified that Mother and Father had Department referrals in March 2002 for alleged neglectful supervision and physical abuse; July 2002 for alleged neglectful supervision; August 2002 for alleged medical neglect, physical abuse,

---

[4]Neither child involved in the December 1997 incident is involved in this case.

physical neglect, and negligent supervision; August 2003 for alleged negligent supervision and physical neglect; August 2004 for alleged negligent supervision, physical abuse, and medical neglect; September 2004 for alleged negligent supervision; and two in March 2005, both for alleged negligent supervision and one for alleged unsanitary living conditions. Mother and Father also tested positive "on numerous occasions" for both marijuana and cocaine during the Lubbock County case.

Baumgarten testified that several of the cases against Mother and Father were closed because abuse had been ruled out, but the Department remained concerned about the level of supervision in light of the injuries the children had sustained. Baumgarten also testified that the children are very physically aggressive toward one another, that Mother and Father have a difficult time controlling them, and that the family visitations were chaotic because of the children's behavior and the parents' inability to control them.

The trial regarding the termination of Mother's and Father's parental rights to H.T. was in May 2008. Baumgarten testified that she and the Department had decided about that same time to remove Mother and Father's other children and proceed toward termination of their parental rights. However, she and the Department lost contact with Mother and Father in June 2008 after they were evicted from their apartment. After an investigation, Baumgarten was told by a relative that Mother and Father had possibly moved with their children to the Fort Worth area.

4

Sandra Boyle is a Department investigator in Fort Worth and investigated a referral alleging neglectful supervision by Mother in September 2009. Boyle testified that the apartment where Mother lived with the children was not clean; had roaches; and did not have food, personal hygiene products, or a place for the children to sleep. Mother also field-tested positive for cocaine.

Boyle testified that the three oldest children, D.A.T., T.D.T, and K.J.T., fled the apartment through the second-story balcony when they realized she worked for the Department. The children later told her they had been told to run if they saw the police or any Department workers. Boyle testified that Mother told her the family had moved to Fort Worth to avoid further termination proceedings in Lubbock. Mother also told Boyle that the children had not been enrolled in school for more than a year, that she had not applied for food stamps, and that the children had not been to the doctor or taken their medication.

Boyle testified that she removed S.S.T. the day she visited the apartment and that Mother called three days later and agreed to surrender the other three children to Department custody. Father accompanied Mother when they brought the children; he denied living in the apartment with Mother but said he did not want to answer any other questions. Boyle said the children gave conflicting accounts of how often Father lived in the apartment with them.

Boyle testified that D.A.T., T.D.T, and K.J.T. had an extensive amount of scars and fresh, suspicious looking marks all over their bodies. She testified that she did not get an explanation for the marks, but she agreed that none of the

5

children required medical attention, that the marks were possibly consistent with marks that kids might receive while rough-housing, and that the children did not appear underweight or malnourished.

Ildiko Balla conducted psychological evaluations of Mother and Father. She testified that Father has difficulty reading and writing and is borderline intellectual functioning. He has difficulty paying attention and in dealing with and parenting in new situations. Balla also testified that Father has anxiety issues and depressive disorder and that he needs assistance making legal, medical, and financial decisions. Balla testified that Father expressed how much he misses his children, that he regrets not being there for them more, and that he wanted to be a better father. Balla also testified that it is possible that Mother could provide the assistance that Father requires.

Constance Burdick is a counselor and clinical social worker. She had met with the family on a weekly basis during the two months preceding the trial. Burdick testified that Mother is the spokesperson for the couple and that she often answers questions directed to Father. She testified that Mother and Father always had an excuse or explanation for their actions or inactions instead of accepting responsibility, and she said there is no reason to continue counseling if Mother and Father cannot accept that improvement is possible. Burdick testified that Mother and Father had not admitted that they could improve their parenting and that Mother and Father had made very little progress after six counseling sessions. Burdick acknowledged that Father had not expressly denied poor

parenting and that, to keep the children, Father was willing to leave Mother if she could not stay off of drugs. But Burdick qualified her testimony by saying that Father cannot raise the children alone without assistance and that Mother is not providing the assistance he needs.

Shawna Wells-Lewis served as the Department caseworker during much of the present case. She testified that both parents tested positive in March 2010 for cocaine, that Father gave her no contemporaneous explanation, and that Mother claimed that grease in Father's hair caused the positive result. The March 2010 drug test was Father's only positive result, and Wells-Lewis agreed that Father's follow-up hair follicle test was negative and that drugs were not a daily problem for him. Wells-Lewis testified, however, that the parents had shown a pattern beginning with the Lubbock County proceedings of staying clean for a time but relapsing into occasional drug use.

Wells-Lewis testified that both parents had attended anger management classes and that anger management was no longer a concern. She also agreed that Mother and Father had not caused the children's scars and that the children often injure one another. Wells-Lewis also confirmed both Mother's and Father's employment with J.T. Kennard. She testified, however, that Mother and Father had been unsuccessfully discharged from homemaking services on one occasion and family counseling on two occasions.

Wells-Lewis testified that the family had visitation every two weeks for an hour and a half. Mother and Father consistently attended the visitations, but

7

Wells-Lewis personally supervised the visitations because they were so chaotic. The children were aggressive with one another, the parents could control only one child at a time, and the parents did not pay attention to the risks that their children could be injured. At one visitation at a playground, Father went to a different playground area to play tic-tac-toe by himself. Wells-Lewis testified that this visitation was similar to most of the other visitations.

Wells-Lewis described D.A.T. as more withdrawn than the other children during visitations, saying that he "takes on more of the parental role." She testified that D.A.T. "loves his parents very much, and he always wants [Mother] to braid his hair." She described S.S.T. as very withdrawn during recent visitations and said that she had stayed to herself drawing pictures. Wells-Lewis testified that T.D.T. and K.J.T. look forward to visitations, hang all over their parents during the visits, and fight for Mother's and Father's attention. She testified that all of the children love their parents and want to return home.

Wells-Lewis acknowledged that the children had been in four foster homes in the previous year, but she said three of those placement changes were due to the children's behavioral problems. D.A.T. and S.S.T. live together, and T.D.T. and K.J.T. each live in different foster homes. T.D.T. and K.J.T. initially lived with D.A.T. and S.S.T. but were moved because of their behavior. Wells-Lewis agreed that it is not wise to continually move the children because of their adjustment disorders.

8

Wells-Lewis testified that S.S.T. is the best-behaved of the children but that she "has a difficult time with no and she screams and hollers and has tantrums and can be very bossy and will bully the others." She testified that K.J.T. has "severe behavior issues"; that he will scream, throw tantrums, scratch himself, try to hurt himself; and that "he will go on for an hour at a time when he doesn't get his way, . . . even try[ing] to destroy property." D.A.T. lies, bullies other children, gets into fights at school, and has tried to get S.S.T. to steal for him. T.D.T. also fights and scratches himself. He will often have meltdowns "to where he can't function, and he'll just scream and scratch himself and not be able to function." Wells-Lewis categorized D.A.T's. and S.S.T.'s required level of care as moderate and T.D.T.'s and K.J.T.'s level of care as specialized. She testified that D.A.T.'s behavior had improved significantly in a foster home and that T.D.T. and K.J.T. had experienced small improvements but were still scratching themselves eleven months after removal.

Wells-Lewis testified that she had looked into several placement options for the children with family members and friends but that none were appropriate. For example, B.T. left D.A.T. in a car by himself while shopping; D.W.F. and C.T.F. had allowed Mother and Father contact with the children without Department supervision; K.M. and E.P. refused placement; J.W., L.W., and V.A. were denied placement because of a history with the Department; S.F. twice withdrew from the home study; N.T. had an open investigation concerning

9

neglectful supervision; and H.T. and D.T.'s parents refused placement.[5] The children's current foster parents do not want to adopt, but Wells-Lewis testified that there are services available to work with the children and any prospective adoptive parents that will be beneficial and make the children adoptable. In addition, Wells-Lewis testified that although the children were not easily adoptable, she planned to enroll the children in an intensive adoption program to facilitate placement.

Wells-Lewis testified that the children have a special need for a stable and very secure environment because of their behavioral issues and that Mother and Father cannot safely parent the children. In her opinion, Mother and Father have been offered all of the services that can be offered. They completed some of their service plan, but they are not demonstrating the skills they should have learned from working the service plan. Wells-Lewis testified that she is concerned about Mother's and Father's ability to provide a stable, clean, and safe environment for the children; their lengthy history with the Department; their drug use; and their consistent failure to provide for the children. She testified she believes, given Mother's and Father's lack of improvement and drug history and despite the strong bond between them and their children, that it is in the children's best interest to terminate Mother's and Father's parental rights.

---

[5]Mother's and Father's parental rights to H.T. and D.T. were terminated in the Lubbock County proceedings in 2008.

Lara Hastings is a psychologist. She conducted psychological evaluations of each child. She also conducted a sibling assessment with the goal of determining the best way to work with the children because of their strong bond but frequent fighting. In the sibling assessment, Hastings determined that sibling therapy could not succeed with all four until K.J.T. and T.D.T. can stabilize their behavior and productively participate. In fact, Hastings testified that she felt K.J.T. and T.D.T. had deteriorated since she had conducted individual psychological assessments approximately nine months earlier.

Hastings testified that T.D.T. has an adjustment disorder with behavioral and emotional disturbances. He experiences distress from being separated from Mother and "possibly both of his parents," and he experiences stress from his home environment. T.D.T. also has depressive disorder that manifests itself in acting out, anger, and suicidal ideations, and it causes him to be emotionally overwhelmed. Hastings testified that T.D.T. may also have attention deficit, hyperactivity disorder (ADHD) and may be borderline intellectual functioning and that those things need to be ruled out or confirmed.

Hastings testified that D.A.T. has adjustment disorder that manifests with emotional and behavioral disturbances. K.J.T. has the same adjustment disorder with similar manifestations, but he also has ADHD. Math disorder, reading disorder, and borderline intellectual functioning also need to be confirmed or ruled out for K.J.T. S.S.T. is the best-adjusted of all of the children, but she also

11

has adjustment disorder with emotional distress manifestations and is "perturbed" by being separated from Mother.

Hastings testified that all of the children lack awareness of appropriate boundaries and that their home environment before entering foster care contributed to their adjustment disorders. She also testified that each of the children's adjustment disorder could be treated through additional therapy.

Elvina Hiatt is the court-appointed special advocate (CASA) for the children. She testified that Mother's and Father's past drug use concerns her and that she worries about keeping the children in a status where they could ultimately be returned to their parents. Hiatt also expressed concern over Mother's and Father's lack of progress after working their service plan and testified that she does not believe Mother and Father will ever change since they have had years of Department history without change.

Hiatt described D.A.T. as a shy child who is respectful of his foster mother and who seems to be doing well. She described S.S.T. as very open and talkative, dramatic and creative, very sweet, and doing well in foster care. Hiatt testified that K.J.T. is more active and less able to control his behavior. She testified that he seems calmer in his newest foster placement but acknowledged that he had not been there long enough to consider his behavioral change permanent. Hiatt described T.D.T. as extremely shut down toward her initially but that he had opened up over time. She said, however, that "something

happened," and T.D.T. reverted back to being shut down. He opened up again after being transferred to a therapeutic foster home.

Hiatt also testified about each of the children's progress in school. S.S.T. is on target and doing well. D.A.T. is one grade-level behind and reads two years behind for his age, and T.D.T. will probably repeat first grade. K.J.T. is one grade-level behind for his age, and he was recently placed in special education classes.

Hiatt testified that the children are active, rowdy, and rough during visitations and that although Mother yells directives to them, they largely ignore her. She testified that Father is not very active in the visitations and will occasionally play with the children, and she said that the children do not approach Father to interact with him. Hiatt testified that Father will occasionally discipline the children but that they do not usually respond unless Mother also gets involved. She agreed that Father had been more active and involved with the children during recent visitations, but she testified that his parenting skills seem not to have progressed. Hiatt also testified that, in her opinion, the children separate well from their parents after visitations.

Hiatt testified that K.J.T. talks about his parents a lot and wants to go home. D.A.T. says he wants to go home, but when he does so, he does not make eye contact, speaks very softly, and acts as if he is not being honest.

Hiatt recommended termination of Mother's and Father's parental rights. She does not believe Mother and Father can provide a safe environment for the

13

children, and she testified that she believes the children have better opportunities in foster care than Mother and Father can provide.

Mother testified that Father had recently been very helpful by becoming more involved with the children's discipline and that she had learned in parenting classes that both parents must be involved. Mother also testified that she had learned in homemaking classes the importance of setting priorities and of practicing financial stability. She testified that she and Father can provide more stability for the children than before because they have steady employment as well as extended family and their church to support them. Mother acknowledged that she and Father do not currently have any money in a bank account, that they would require government assistance, and that they would have to find a larger place to live. She testified, however, that she had already located a larger apartment for the same amount of monthly rent and that her boss had offered to advance her the money to buy beds for the children.

J.T. Kennard testified that he is Mother and Father's pastor and employer. Mother and Father have worked for him in his junkyard for approximately two years. Kennard testified that Mother and Father are good parents, that they consistently attend work, and that he allowed them to miss work when they attended appointments for their service plan. He also testified that Mother and Father maintain a home cleaner than his own, but he acknowledged that he had never been inside their apartment and had only been to their apartment to pick them up for work or for church.

Father testified that he does not like to talk much and that he had always been that way. He testified that he has supported his family since he began working for Kennard, and he expressed his belief that he could care for the children without Mother's help if necessary. Father also testified that he does not think the children have behavior problems and that he thinks he controls them well enough during visitations. Father acknowledged that he does not have a driver's license, and he denied using cocaine in March 2010, saying that he tested positive because he had associated with others that had used cocaine.

### III. Applicable Law

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination

15

proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re*

16

*H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D) and (E) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28.  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  *H.R.M.*, 209 S.W.3d at 108.

## IV.  Father's Appeal

The trial court found that Father had (1) engaged in conduct or knowingly placed the children with persons who had engaged in conduct which endangered the physical or emotional well-being of the children, (2) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, and (3) previously had his parent-child relationship terminated with respect to another child based on these same grounds.  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (M).  Father argues in his first two issues that the evidence is factually insufficient to support the section 161.001(1)(D) and (E) findings, and he argues in his third issue that the Department's pleadings do not support the section 161.001(1)(M) finding.

17

## A. Endangerment Findings

Father argues in his first and second issues that the evidence is factually insufficient to support the trial court's section 161.001(1)(D) and (E) findings.

### 1. Applicable Law

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under section 161.001(1)(D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct

result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

### 2. Discussion

Baumgarten, Mother and Father's caseworker in Lubbock, described Mother and Father's lengthy history with the Department, their nine Department referrals between 1997 and 2005, and their drug use. Boyle, the investigator in Fort Worth, testified that the children had not been enrolled in school for more than a year in 2009, that Mother had not applied for food stamps, and that the children had not been to the doctor or taken their medication. Father denied living in the apartment with Mother and the children at the time but declined to answer additional questions, and the children gave conflicting accounts of how often Father lived in the apartment with them.

Burdick, the counselor for the family, testified that Mother and Father always had an excuse or explanation for their actions or inactions instead of accepting responsibility, and she said there is no reason to continue counseling if Mother and Father cannot accept that improvement is possible. Burdick acknowledged that Father had not expressly denied poor parenting, but she testified that Father cannot raise the children alone without assistance.

Although she agreed that drugs were not a daily problem for Father, caseworker Wells-Lewis testified that both parents tested positive in March 2010 for cocaine, that Father gave her no contemporaneous explanation, and that Mother claimed that grease in Father's hair caused the positive result. Wells-Lewis also testified, however, that both parents had a pattern of staying clean for a time but relapsing into occasional drug use.

Wells-Lewis described the children as aggressive with one another, and she testified that neither parent pays attention to the risks that their children could be injured. She also testified that Mother and Father cannot safely parent the children. In her opinion, Mother and Father have been offered all of the services that can be offered. Although they completed some of their service plan, they have not, in her opinion, demonstrated the skills they should have learned from working the service plan. Hiatt, the CASA, also expressed concern over Mother's and Father's lack of progress after working their service plan and testified that she does not believe Mother and Father will ever change since they have had years of Department history without change. Father testified that he

does not think the children have behavior problems and that he controls them well enough during visitations.

After reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Father had engaged in conduct or knowingly placed the children with persons who had engaged in conduct which endangered the physical or emotional well-being of the children or that Father had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *C.H.*, 89 S.W.3d at 28. We therefore overrule Father's first and second issues.[6]

## B.  Best Interests of the Children

Father argues in his fourth issue that the evidence is factually insufficient to support the trial court's finding that termination of his parental rights to the children is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2) (requiring clear and convincing evidence "that termination is in the best interest of the child").

---

[6]Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). We thus need not address Father's third issue. *See id.*; *see also* Tex. R. App. P. 47.1, 47.4.

**1. Applicable Law**

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;
>
> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
>
> (C) guidance and supervision consistent with the child's safety;
>
> (D) a safe physical home environment;
>
> (E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and
>
> (F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.,* 209 S.W.3d at 116.  Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

> (A)  the desires of the child;
>
> (B)  the emotional and physical needs of the child now and in the future;
>
> (C)  the emotional and physical danger to the child now and in the future;
>
> (D)  the parental abilities of the individuals seeking custody;
>
> (E)  the programs available to assist these individuals to promote the best interest of the child;
>
> (F)  the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## 2. Discussion

The children range in age from eleven to five years old, and each is emotionally vulnerable.  K.J.T. has ADHD, and T.D.T. has a depressive disorder that manifests through suicidal ideations and anger.  Each child has an attachment disorder, takes medication, and has behavioral issues.  Three of the four children are not on pace academically.  Wells-Lewis testified that the children have a special need for a stable and very secure environment.  *See Holley*, 544 S.W.2d at 372 (listing "the emotional and physical needs of the child now and in the future" as relevant to best interest determination).

Father has difficulty reading and writing, is borderline intellectual functioning, and needs assistance with making legal, medical, and financial decisions.  He also has anxiety issues, a depressive disorder, and difficulty parenting in new situations.  *See In re T.T.F.*, 331 S.W.3d 461, 488 (Tex. App.— Fort Worth 2010, no pet.) (considering mother's inability to recognize risk to her child and mother's intellectual capacity in best interest analysis).  Mother is the spokesperson for the couple.  Father is often detached, even at visitations, but had exhibited improvement just before trial.  *But see In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (explaining that a father's "efforts to improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting and neglect").

Father expressed regret about being separated from his children, a desire to be a better father, and a willingness to leave Mother if necessary, but Burdick testified that Father cannot raise the children alone without assistance.  Father also tested positive for cocaine six months before trial.  *See* Tex. Fam. Code Ann. § 263.307(b)(8) (listing history of drug use as relevant best interest factor).

The children are aggressive with one another, and Mother and Father do not seem to grasp the risk of injury to their children in various settings, including supervised visitations.  There is no evidence that Mother or Father physically abused the children, but the children apparently injure one another.  Mother and Father had nine Department referrals while living in Lubbock, and all of the referrals involved neglectful supervision.  The children were removed from

25

Mother and Father twice in Lubbock and might have been removed again, but the family moved to Fort Worth. When the children were removed in Fort Worth in 2009, they had extensive scarring and bruising on their bodies.

Father has not denied poor parenting, but there is testimony that he and Mother always offer excuses rather than an acknowledgement of responsibility. Mother and Father had not admitted that they could improve their parenting, and Father denied at trial that the children have behavioral problems. There is also testimony that Mother and Father had not demonstrated the skills they should have learned through the service plan and that they have been offered all of the services that can be offered. *See id.* § 263.307(b)(10), (11) (listing as relevant best interest factors the parents' willingness to accept and complete services offered and to effect positive changes within reasonable time).

Father testified that he has support available from family and friends, and Mother testified that she and Father could provide more stability than before because of their steady employment, their extended family, and the support offered by their church. Their employer has also offered assistance in the form of advances on their wages when necessary to buy things for the children. *See id.* § 263.307(b)(13) (listing social support system as relevant best interest factor). Mother and Father, combined, earned approximately $37,440 per year and had lived in the same townhome for approximately nine months before trial. Mother admitted, however, that she and Father would have to find a larger place to live if the children were returned to them, and Mother had found one for the same rent.

There is a strong bond between the children and their parents, and the children would like to return to their parents. *See Holley*, 544 S.W.2d at 372 (listing desires of child as relevant to best interest analysis). The children had been in foster care for almost one year at the time of trial, and although they had been in multiple foster homes, three of the changes were a result of the children's behavioral problems.

Wells-Lewis testified that the Department would like to have the children adopted. *See id.* (listing proposed placement plan as relevant to child's best interest). Wells-Lewis testified that she had looked into almost twenty family members and friends as possible placements for the children but that none were appropriate. The children's current foster parents do not want to adopt, but Wells-Lewis testified that the Department has services available to work with the children and any prospective adoptive parents to facilitate adoption.

Considering the factors listed in family code section 263.307(b) and discussed in *Holley*, and viewing all the evidence in a neutral light, we conclude that the trial court could reasonably form a firm conviction or belief that termination of Father's parental rights is in the children's best interests. *See H.R.M.*, 209 S.W.3d at 108; *see also Shaw v. Tex. Dep't of Family & Protective Servs.*, No. 03-05-00682-CV, 2006 WL 2504460, at *7 (Tex. App.—Austin Aug. 31, 2006, pet. denied) (mem. op.) (holding despite improvement before trial, termination was in child's best interest considering mother's borderline intellectual functioning, psychological disorder, drug dependence, lack of

27

improvement in parenting skills, and lack of accountability). We therefore hold that the evidence is factually sufficient to support the trial court's best interest finding, and we overrule Father's fourth issue.

### V. Mother's Appeal

Mother's court-appointed appellate counsel has filed a motion to withdraw as counsel and a brief in support of that motion. In the motion, counsel avers that he has conducted a professional evaluation of the record and, after a thorough review of the applicable law, has reached the conclusion that there are no arguable grounds to be advanced to support an appeal of this cause and that the appeal is frivolous.

Counsel's brief and motion meet the requirements of *Anders* by presenting a professional evaluation of the record demonstrating why there are no reversible grounds on appeal and referencing any grounds that might arguably support the appeal. *See Anders*, 386 U.S. at 741, 87 S. Ct. at 1398; *Mays v. State*, 904 S.W.2d 920, 922–23 (Tex. App.—Fort Worth 1995, no pet.). This court has previously held that *Anders* procedures apply in parental rights termination cases when the Department has moved for termination. *In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.). Mother was given the opportunity to file a pro se brief on her own behalf, but she did not do so.

In our duties as a reviewing court, we must conduct an independent evaluation of the record to determine whether counsel is correct in determining that the appeal is frivolous. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex.

Crim. App. 1991); *Mays*, 904 S.W.2d at 923. Only then may we grant counsel's motion to withdraw. *See Penson v. Ohio*, 488 U.S. 75, 82–83, 109 S. Ct. 346, 351 (1988).

We have carefully reviewed the appellate record and Mother's appellate counsel's brief. We agree with her appellate counsel that the appeal is wholly frivolous and without merit. We find nothing in the record that might arguably support the appeal. *See Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005); Taylor v. Tex. Dep't of Protective & Regulatory Servs., 160 S.W.3d 641, 646–47 (Tex. App.—Austin 2005, pet. denied). Therefore, we grant Mother's appellate counsel's motion to withdraw and affirm the trial court's judgment terminating Mother's parental rights to her children.

## VI. Conclusion

Having granted the motion to withdraw filed by Mother's counsel, and having overruled Father's dispositive issues, we affirm the trial court's judgment terminating Father's and Mother's parental rights to D.A.T., K.J.T., T.D.T., and S.S.T.

ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DAUPHINOT, J., concurs without opinion.

DELIVERED:  May 31, 2012